Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

Fort Worth Division

| | | |
|---|---|---|
| CHARLES DUSTIN MYERS | ) | Case No. 4:26-cv-00192-P-BJ |
| | ) | *(to be filled in by the Clerk's Office)* |
| | ) | |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | Jury Trial: *(check one)* ✔ Yes ☐ No |
| **-v-** | ) | |
| SEE ATTACHED DEFENDANT LIST | ) | |
| | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | |

## SECOND AMENDED
## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Charles Dustin Myers |
| Street Address | 1209 Blairwood Drive |
| City and County | Flower Mound, Denton County |
| State and Zip Code | Texas 75028 |
| Telephone Number | 469-770-0671 |
| E-mail Address | chuckdustin12@gmail.com |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

Defendant No. 1

| | |
|---|---|
| Name | James B. Munford |
| Job or Title *(if known)* | Judge, 322nd District Court (official capacity) |
| Street Address | Family Law Center, 200 E. Weatherford St., 4th Floor |
| City and County | Fort Worth, Tarrant County |
| State and Zip Code | Texas 76196-0230 |
| Telephone Number | 817-884-1427 |
| E-mail Address *(if known)* | Unknown |

Defendant No. 2

| | |
|---|---|
| Name | Ruth Anne Thornton |
| Job or Title *(if known)* | Director of Child Support / IV-D Director (official capacity) |
| Street Address | OAG Child Support Division, P.O. Box 12017 |
| City and County | Austin, Travis County |
| State and Zip Code | Texas 78711-2017 |
| Telephone Number | 512-460-6000 |
| E-mail Address *(if known)* | Unknown |

Defendant No. 3

| | |
|---|---|
| Name | Thomas A. Wilder |
| Job or Title *(if known)* | Tarrant County District Clerk (official capacity) |
| Street Address | 100 N. Calhoun St. |
| City and County | Fort Worth, Tarrant County |
| State and Zip Code | Texas 76196 |
| Telephone Number | 817-884-1574 |
| E-mail Address *(if known)* | Unknown |

Defendant No. 4

| | |
|---|---|
| Name | Cooper L. Carter (Cooper Leanne Carter) |
| Job or Title *(if known)* | Attorney, Marx Altman & Johnson (individual capacity) |
| Street Address | Marx Altman & Johnson, 2905 Lackland Rd. |
| City and County | Fort Worth, Tarrant County |
| State and Zip Code | Texas 76116 |
| Telephone Number | 817-926-6211 |
| E-mail Address *(if known)* | COOPERCARTER@MAJADMIN.COM |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

## ATTACHMENT TO PART I.B - DEFENDANT NO. 5
## AND COMPLETE DEFENDANT LIST

### Defendant No. 5

| | |
|---|---|
| Name | Morgan Michelle Myers |
| Job or Title (if known) | Individual / private party (individual capacity) |
| Street Address | 6641 Anne Court |
| City and County | Watauga, Tarrant County |
| State and Zip Code | Texas 76148 |
| Telephone Number | 817-940-0852 |
| E-mail Address (if known) | MORGANMW02@GMAIL.COM |

### Complete Defendant List

1. James B. Munford, in his official capacity as Judge of the 322nd District Court of Tarrant County, Texas;

2. Ruth Anne Thornton, in her official capacity as Director of Child Support / IV-D Director, or current equivalent Texas Child Support Division official;

3. Thomas A. Wilder, in his official capacity as Tarrant County District Clerk, or successor custodian of district-court filing, notice, service, recipient, attorney-recipient, service-contact, transaction, ledger, manual-notice, file-stamp, and case-access records;

4. Cooper L. Carter, in her individual capacity;

5. Morgan Michelle Myers, in her individual capacity.

Attachment to Part I.B - Defendant No. 5

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question                ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

42 U.S.C. § 1983; Fourteenth Amendment procedural due process and equal protection; 28 U.S.C. §§ 1331, 1343, 1367, 2201, 2202, and 1391.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

Page 3 of  5

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

b.      If the defendant is a corporation

The defendant,  *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.      The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

N/A - jurisdiction is based on federal question, not diversity of citizenship.

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

See attached Second Amended Complaint. Plaintiff alleges a state-backed process sequence beginning January 16, 2024, including removal from the residence before adequate process, a March 6 lockout and police-facing use of court papers, a March 14 false-consent temporary-order path, a May 2024 IWO effort, a June 28, 2024 Title IV-D/OAG intervention, and continuing reliance on disputed enforcement and notice records.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See attached Second Amended Complaint. Plaintiff seeks prospective declaratory/injunctive relief requiring preservation, identification, authentication, and a meaningful opportunity to contest disputed Title IV-D, filing, notice, service, and enforcement predicate records before additional enforcement reliance. Plaintiff does not ask this Court to modify, vacate, reverse, recalculate, or act as an appellate tribunal over the Texas divorce decree.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

Plaintiff seeks damages only from Cooper L. Carter and Morgan Michelle Myers, including compensatory damages in amounts to be proven, nominal damages for proven constitutional injury, punitive damages if proven, costs, and supplemental state-law damages. Plaintiff seeks no damages from Munford, Thornton, Wilder, any state agency, or any county office.

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        April 27, 2026

Signature of Plaintiff        /s/ Charles Dustin Myers

Printed Name of Plaintiff        Charles Dustin Myers

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**ATTACHMENT TO COMPLETED TXND CIVIL COMPLAINT FORM**
**SECOND AMENDED COMPLAINT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| CHARLES DUSTIN MYERS, | § | |
| Plaintiff, | § | |
| v. | § | |
| JAMES B. MUNFORD, in his official | § | |
| capacity as Judge of the 322nd District Court | § | |
| of Tarrant County, Texas; | § | |
| RUTH ANNE THORNTON, in her official | § | |
| capacity as Director of Child Support, IV-D | § | Civil Action No. 4:26-cv-00192-P-BJ |
| Director, or current equivalent Texas Child | § | |
| Support Division official; | § | |
| THOMAS A. WILDER, in his official | § | |
| capacity as Tarrant County District Clerk, or | § | |
| successor custodian of district-court filing, | § | |
| notice, service, recipient, attorney-recipient, | § | |
| service-contact, transaction, ledger, manual- | | |
| notice, file-stamp, and case-access records; | | |
| COOPER L. CARTER, in her individual | | |
| capacity; | | |
| MORGAN MICHELLE MYERS, in her | | |
| individual capacity, | | |
| Defendants. | | |

**SECOND AMENDED COMPLAINT FOR DECLARATORY,**
**PROSPECTIVE INJUNCTIVE, AND DAMAGES RELIEF**
**42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1343, 1367, 2201, 2202, and 1391**
**I. Preliminary Statement**

1. This case is about process.

2. Plaintiff had no constitutionally meaningful process before the deprivation began, no meaningful process while the deprivation was converted into purported "agreed" orders, no meaningful process before those disputed orders were transformed into Title IV-D enforcement, no meaningful process when post-trial enforcement consequences were imposed, and no meaningful process when the official notice and filing records used against him became unreliable, unauthenticated, and materially disputed.

1

3. Plaintiff does not ask this Court to act as a divorce court.

4. Plaintiff does not ask this Court to grant a divorce, undo a divorce, modify conservatorship, change possession, recalculate support, erase arrears, redivide marital property, or substitute federal domestic-relations judgment for Texas domestic-relations judgment.

5. Plaintiff asks this Court to adjudicate independent federal due-process injuries caused by state-backed deprivation and future enforcement reliance on disputed predicate records that were never meaningfully tested, authenticated, or subjected to adequate process.

6. The final decree did not cause the first injury. The final decree solidified the injury.

7. The injury began on January 16, 2024, when Plaintiff was removed from his home and ordinary parental position before a completed evidentiary hearing and before constitutionally adequate process.

8. The injury deepened on March 6, 2024, when Myers used the developing court-paper trail to lock Plaintiff out of the residence and obtain police-facing practical dispossession.

9. The injury became institutionalized on March 14, 2024, when Carter allegedly converted a hearing on Plaintiff's emergency motion into a false-consent temporary-order event, despite nonresponse to the emergency motion, lack of a motion-to-sign path, lack of Plaintiff's signature, lack of actual consent, and lack of predicate authentication.

10. The injury became enforceable through state machinery when Carter attempted an IWO bridge and the OAG later filed a Title IV-D intervention relying on the March 14 order as the prior support order.

11. The injury became a federal record-integrity problem when the OAG intervention used "Office Filer 914 on behalf of Holly Hayes," while the actual human signer, filer, reviewer,

2

authorizer, supervisor, contractor/employment status, and account path were never identified or authenticated despite repeated challenge.

12. The injury became a clerk/notice-integrity problem when the District Clerk's office repeatedly transmitted manual notices while ReSearchTX notice issues remained unresolved, when NOT SENT eService events appeared at critical points, and when attorney-recipient/service-contact/account anomalies arose after Plaintiff challenged the Hayes/ Office Filer 914 path, including the manual blocking of case notices.

13. This complaint therefore pleads: (1) prospective  due-process relief against the Title IV-D official responsible for future enforcement reliance; (2) prospective  record-preservation and authentication relief against the District Clerk record custodian; (3) narrow  declaratory relief against the state judge only insofar as unresolved predicate defects remain relevant to future reliance and do not require decree modification; and (4) da  mages against Carter and Myers because their conduct plausibly satisfies close-nexus and joint-action state-action standards.

14. Plaintiff pleads facts, not labels. Plaintiff identifies the events, dates, documents, systems, state-action bridges, records, and injuries that make each Defendant plausibly liable or properly subject to prospective relief.

15. Plaintiff recognizes that screening under 28 U.S.C. § 1915(e)(2)(B) tests     plausibility, not proof. Plaintiff need not prove his case at the pleading stage. Plaintiff must plead a plausible claim for relief. This complaint does so.

**II. Jurisdictional Boundary and Non-Domestic-Relations Disclaimer**
16. Plaintiff does not complain merely that the state court entered an adverse decree.

17. Plaintiff complains that he was deprived through a process sequence that failed at every meaningful safeguard and that Defendants continue to rely, or are positioned to rely, on disputed predicate records without authentication.

3

18. If this Court grants the prospective relief requested, the Texas decree remains formally in place.

19. If this Court grants the prospective relief requested, the state court remains free to adjudicate state domestic-relations merits.

20. If this Court grants the prospective relief requested, state appellate courts remain free to review state judgments.

21. The relief requested here regulates future reliance on disputed official predicates, not the family-law merits.

22. Plaintiff does not seek relief that requires this Court to decide who should have custody, who should possess the children, what support should be, whether arrears should be recalculated, or how marital property should be divided.

23. Plaintiff seeks relief requiring that future enforcement based on disputed records not proceed until the records are preserved, identified, authenticated, and contestable through constitutionally meaningful process.

24. Plaintiff also seeks damages from private Defendants for injuries caused by their alleged joint participation in state-backed deprivation.

**III. Parties**

25. Plaintiff Charles Dustin Myers is a natural person and citizen of Texas. His mailing address is 1209 Blairwood Drive, Flower Mound, Texas 75028. His email address is chuckdustin12@gmail.com.

26. Defendant James B. Munford is sued in official capacity only as Judge of the 322nd District Court of Tarrant County, Texas.

27. Plaintiff seeks no damages from Judge Munford.

4

28. Plaintiff names Judge Munford because the unresolved predicate-formation defects remain relevant to future enforcement reliance in the same cause, because the findings and rulings avoided the controlling process questions, and because narrow declaratory relief is necessary to prevent future reliance on those unresolved predicates without requiring this Court to alter the decree.

29. Plaintiff does not seek to control Judge Munford's future adjudicative decisions, impose damages for past judicial acts, or obtain federal appellate review of his rulings.

30. Defendant Ruth Anne Thornton is sued in official capacity only as Director of Child Support, IV-D Director, or current equivalent Texas Office of the Attorney General Child Support Division official with supervisory responsibility over Title IV-D enforcement, wage withholding, arrears collection, payment processing, enforcement records, Title IV-D cost allocation, and future reliance on child-support enforcement predicates.

31. Thornton is connected to the ongoing controversy because the Child Support Division and Title IV-D systems are the official channels through which the disputed June 28, 2024 intervention, alleged support arrears, wage-withholding exposure, payment records, and enforcement predicates may be used prospectively against Plaintiff.

32. Plaintiff seeks no damages from Thornton.

33. Defendant Thomas A. Wilder is sued in official capacity only as Tarrant County District Clerk, or successor custodian of district-court filing, notice, service, recipient, ledger, transaction, file-stamp, manual-notice, party-contact, attorney-recipient, service-contact, attorney-removal, case-access, and case-configuration records for cause number 322-744263-23 and related cause number 233-765358-25.

34. Wilder is connected to the ongoing controversy because clerk-controlled records are used to establish notice, service, filing identity, recipient identity, party status, attorney-recipient status, case notices, manual notices, attorney removal, service-contact changes, and enforcement predicates.

35. Plaintiff alleges Wilder's office repeatedly transmitted manual notices while ReSearchTX notice issues remained unresolved, including notices for the order denying the OAG strike motion, final decree packet, findings packet, renewed-recusal referral order, and Supreme Court rehearing notice path, and later removed both State attorneys from the case without a motion.

36. Plaintiff alleges Wilder's office, as district-court record custodian, is the proper official-capacity defendant for preservation and authentication of notice, recipient, service-contact, attorney-recipient, transaction, ledger, manual-notice reason, and case-access records used against Plaintiff as well as records regarding Holly Hayes, the alleged OAG attorney.

37. Plaintiff seeks no damages from Wilder.

38. Defendant Cooper L. Carter is sued in individual capacity only.

39. Carter was Myers's private attorney in the underlying state proceedings.

40. Plaintiff does not sue Carter for ordinary advocacy.

41. Plaintiff sues Carter because she allegedly supplied, presented, and operationalized disputed false-consent and enforcement predicates that state actors adopted and official systems later relied on.

42. Defendant Morgan Michelle Myers is sued in individual capacity only.

43. Myers was Plaintiff's opposing private party in the underlying state proceedings.

44. Plaintiff does not sue Myers merely because she was an adverse party.

45. Plaintiff sues Myers because she allegedly initiated and sustained state-backed deprivation through disputed emergency allegations, eviction/removal efforts, court-paper use, police-facing dispossession, false-consent predicate use, and continued benefit from Title IV-D enforcement after repeated challenge.

**IV. Jurisdiction, Venue, Standing, and Redressability**

46. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment.

47. This Court has jurisdiction to issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

48. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims against Carter and Myers.

49. Venue is proper under 28 U.S.C. § 1391(b) because the events occurred primarily in Tarrant County, Texas, within the Fort Worth Division.

50. Plaintiff has injury-in-fact because he remains subject to ongoing and threatened enforcement consequences flowing from disputed predicate records, including arrears-collection exposure, wage-withholding exposure, payment-processing exposure, credit/property consequences, inability to authenticate the actual filer/signer/authority for Title IV-D records, notice disruption, clerk-recipient uncertainty, account-access anomalies, and future reliance on unresolved predicates.

51. Plaintiff's injuries are traceable to Defendants because the enforcement path flows through the disputed emergency-removal, alleged-agreement, temporary-order, IWO, OAG intervention, Office Filer 914, clerk-notice, EFM/OFS/ReSearchTX, and Title IV-D record path identified below.

7

52. Plaintiff's injuries are redressable because preservation, identification, authentication, and future-reliance limits would prevent additional enforcement reliance on disputed predicates until Plaintiff receives constitutionally meaningful process.

53. Plaintiff does not seek retroactive monetary relief from any official-capacity Defendant.

54. Plaintiff's official-capacity claims are prospective and record-focused.

**V. Legal Framework Pleaded for Screening**

55. Plaintiff pleads under 42 U.S.C. § 1983 for deprivation of rights secured by the Fourteenth Amendment.

56. Procedural due process requires meaningful notice and a meaningful opportunity to be heard before deprivation of protected interests, except in limited emergency circumstances where adequate post-deprivation process must still exist.

57. Plaintiff had protected interests in home possession, property access, business access, wages, money, credit, parental and familial association, access to official records, and a meaningful opportunity to contest enforcement predicates.

58. Ex parte Young permits prospective official-capacity relief against officials connected to ongoing enforcement of allegedly unconstitutional conduct.

59. Plaintiff's claims against Thornton seek prospective relief against ongoing Title IV-D enforcement reliance.

60. Plaintiff's claims against Wilder seek prospective record preservation and authentication necessary to determine whether notice and enforcement predicates are reliable.

61. Plaintiff's claims against Munford seek only narrow, severable declaratory relief that does not require this Court to modify a state decree.

62. Private parties can be state actors where there is close nexus, joint participation, or private conduct that becomes effective through state adoption, state enforcement, police-facing authority, or official machinery.

63. Plaintiff's claims against Carter and Myers plead those facts specifically.

**VI. Definitions**

64. Predicate records means records used to justify, initiate, continue, enforce, transmit, calculate, authenticate, or represent child-support, wage-withholding, arrears, service, notice, agreement, attorney authority, party status, payment, enforcement, or case-access consequences against Plaintiff.

65. Additional enforcement reliance means future reliance on disputed predicate records to collect, withhold, garnish, intercept, report, execute, suspend, refer, enforce, certify, transmit, or otherwise act against Plaintiff.

66. EFM means the electronic filing manager used for Texas court filings.

67. OFS means the electronic filing system or source reflected in normalized fields such as ofs_filing_id and raw/camelCase fields such as ofsFilingID or ofsFilingId.

68. ReSearchTX means the Texas case-access and notice platform whose records and manual-notice issues appear in Plaintiff's state-court file.

69. Office Filer 914 means the generic filing identity appearing on the June 28, 2024 Title IV-D intervention record and related eService certificate.

70. Title IV-D means the child-support enforcement program lane implicated by the disputed OAG intervention, federal reimbursement, incentive, authority, recordkeeping, and enforcement issues.

71. False-consent predicate means a document, order, proposed order, report, email, or enforcement record that represents, assumes, or operationalizes Plaintiff's agreement to a term,

9

order, withholding mechanism, support obligation, or enforcement consequence that Plaintiff did not actually agree to and specifically challenged.

72. Manual-notice records means district-clerk or court-coordinator emails or transmissions that sent notices manually because automated case-notice processes were not working, were unresolved, were being refined, or were otherwise unreliable.

73. Wilder records means clerk-controlled notice, service, service-contact, attorney-recipient, attorney-removal, case-recipient, party-contact, manual-notice, transaction, ledger, file-stamp, docket, case-access, and case-configuration records necessary to prove or disprove whether Plaintiff received meaningful notice and whether official records were altered, suppressed, manually overridden, or used as enforcement predicates.

**VII. Factual Allegations**

**A. December 2023: the disputed emergency predicate begins**

74. Plaintiff and Myers were parties to divorce proceedings in Tarrant County cause number 322-744263-23.

75. The state case began in December 2023 with divorce and protective-order filings.

76. Plaintiff alleges the initial filings contained false statements regarding family violence, protective-order status, financial indigence, residence exclusion, vehicle/property status, and alleged danger.

77. Plaintiff contested the protective-order allegations.

78. Plaintiff filed papers disputing family violence, disputing emergency need, and raising fraud, illegality, duress, and abuse-of-process themes.

79. Plaintiff alleges the emergency predicate was not tested before it produced actual deprivation.

10

80. Plaintiff alleges the case was structurally defective from the beginning because emergency claims were used as the basis for deprivation before a completed evidentiary hearing, before reliable findings, and before meaningful opportunity to defend.

**B. January 16, 2024: removal-before-completed-hearing deprivation**

81. A protective-order hearing was noticed for January 16, 2024.

82. Plaintiff alleges the 322nd District Court was publicly closed for winter-weather purposes on January 16, 2024.

83. Despite that closure posture, the January 16 sequence produced an interim directive requiring Plaintiff to vacate the marital residence and giving Myers temporary possession of the children pending a later setting.

84. Plaintiff alleges no constitutionally adequate process preceded that deprivation.

85. Plaintiff alleges there was no completed evidentiary hearing, no tested family-violence proof, no reliable statutory finding, and no meaningful opportunity to contest before he was ordered out.

86. Plaintiff alleges this deprived him of home possession, property access, ordinary parental status, day-to-day care and control of the children, access to his home-based business, access to specialized internet and technical infrastructure, stable housing, and ordinary employment continuity.

87. Plaintiff does not ask this Court to reverse the January 16 order. Plaintiff pleads January 16 as the first predicate event in the continuing process injury.

88. The January 16 deprivation changed the entire litigation posture before any meaningful safeguard operated.

**C. January 22 and February 1: continued removal and pressured "agreement"**
89. Plaintiff retained counsel on short notice after the January 16 removal.

11

90. On January 22, 2024, Plaintiff appeared prepared to contest the protective-order and removal predicate.

91. Plaintiff alleges the matter was reset after Carter appeared or was retained by Myers near the setting.

92. Plaintiff alleges this reset continued his displacement without adjudicating the emergency predicate.

93. On February 1, 2024, an associate-judge report was signed and treated as agreed.

94. Plaintiff alleges the February 1 "agreement" occurred under severe pressure because Plaintiff had already been removed from his home, separated from normal parenting status, and placed in a position of urgent need to regain limited home access.

95. Plaintiff alleges the February 1 report gave him only limited temporary access back to the residence while preserving Myers's control over the children and status quo.

96. Plaintiff alleges the February 1 report required a specific reduction-to-writing process: Bacalis would prepare the typed written order, attorneys would approve it, and if no agreement was reached a motion to sign would be filed and set within the required timeframe.

97. Plaintiff alleges the protective-order path was nonsuited or abandoned, but the deprivation remained.

98. Plaintiff terminated Bacalis and proceeded pro se.

99. Plaintiff filed emergency and summary-judgment-type materials challenging the basis for removal, family violence, home exclusion, temporary orders, and child-related restrictions.

**D. Carter/Myers eviction and March 6 lockout: private use of court papers with state-backed effect**

12

100. Plaintiff alleges Myers and her family pursued or participated in an eviction/removal path before meaningful adjudication of the emergency predicate.

101. Plaintiff alleges an eviction notice was served or caused to be served using protective-order/divorce-related predicates before those predicates had been properly adjudicated.

102. Plaintiff alleges this shows private use of anticipated state authority to create home exclusion before process.

103. On March 4, 2024, Plaintiff filed notice that he would not leave the residence until the court heard his emergency motion because children, residence, business, property, and constitutional rights were at stake.

104. On March 6, 2024, while Plaintiff was walking the children to school, Myers locked Plaintiff out of the residence.

105. Plaintiff alleges Myers left a sign and used the developing court-paper trail to justify excluding him.

106. Plaintiff alleges responding officers became involved and recommended that Plaintiff leave after Myers showed court papers or the associate-judge report.

107. This was not merely private self-help. Myers used state-generated papers to produce police-facing practical dispossession.

108. This event supplies a close-nexus and joint-action predicate as to Myers because her conduct became effective through state-paper authority and police-facing effect.

109. The March 6 lockout deepened the January 16 deprivation and further damaged Plaintiff's home access, child access, business access, property access, housing stability, credit, finances, and emotional security.

**E. March 14, 2024: conversion of Plaintiff's emergency hearing into false-consent order path**

13

110. Plaintiff's emergency motion was set for March 14, 2024.

111. The setting was for Plaintiff's emergency motion challenging the deprivation and temporary-order predicate.

112. The setting was not noticed as a new temporary-orders merits hearing.

113. The setting was not noticed as a motion-to-sign hearing.

114. The setting was not noticed as a hearing to convert Carter's disputed paperwork into an agreed temporary order.

115. Carter did not file a substantive response to Plaintiff's emergency motion before the March 14 hearing.

116. Carter nevertheless appeared at the hearing and handed Plaintiff typed temporary orders.

117. Plaintiff alleges the typed orders were prepared or supplied through Carter, not through the Bacalis-preparation process required by the February 1 report.

118. No agreement on the form existed.

119. No motion to sign had been filed and set.

120. Plaintiff alleges Carter also supplied or presented a proposed denial or associate-judge report denying Plaintiff's emergency motion despite having filed no substantive response.

121. The state actor denied Plaintiff's emergency motion and signed or rendered the Carter-prepared temporary orders.

122. The March 14 orders represented, assumed, or were treated as agreed even though Plaintiff did not consent and did not sign the filed order.

123. Plaintiff alleges the March 14 paperwork falsely represented or operationalized: that a temporary-orders hearing occurred; that evidence and argument from both sides were heard; that

14

statutory prerequisites were met; that the order was in the children's best interest; that the parties agreed as shown by signatures; and that Plaintiff had consented to the filed terms.

124. This is the central close-nexus event as to Carter: Carter's private paperwork became state action when the state actor adopted it and made it the official order.

125. Carter's conduct did not merely request relief. Carter supplied the operative instrument adopted by the state.

126. That instrument then became the basis for home, parenting, support, arrears, IWO, and OAG enforcement consequences.

127. Plaintiff alleges this was a constitutional deprivation because the hearing on his emergency motion was converted into a state-adopted false-consent event without response, notice, consent, evidence testing, or required motion-to-sign procedure.

128. The March 14 false-consent predicate sustained the deprivation for roughly two and a half years.

**F. May 2024 IWO bridge**

129. On or about May 9, 2024, Carter emailed Plaintiff an Income Withholding Order.

130. Carter described the IWO as agreed by the parties and ordered by the Court.

131. Carter stated she would file the IWO and submit it to the judge for signature if Plaintiff did not communicate within ten days.

132. Plaintiff objected that the IWO was defective and not agreed.

133. Plaintiff alleges the docket extract he later reviewed did not show a corresponding IWO or withholding filing around that May 2024 sequence.

134. The May 2024 IWO effort is a private-to-state enforcement bridge: disputed order, alleged agreement, IWO document, threatened judicial submission, wage-withholding consequence, and later OAG enforcement.

135. This event makes Carter's state-action theory stronger because wage withholding is state-backed enforcement machinery, not ordinary advocacy.

**G. June 28, 2024 OAG intervention: disputed private predicate becomes official Title IV-D enforcement**

136. On June 28, 2024, the OAG filed a Title IV-D intervention in the divorce cause.

137. The intervention stated the OAG represented the State of Texas.

138. The intervention stated the OAG was assigned support and enforcement rights.

139. The intervention identified Myers as the parent with whom the children resided.

140. The intervention stated Myers would be served through Carter.

141. The intervention expressly relied on the March 14, 2024 support order as the prior child-support order.

142. The intervention alleged Plaintiff owed $973.19 per month beginning April 1, 2024.

143. The intervention alleged arrears of $2,919.57 as of June 18, 2024.

144. The intervention sought confirmation and judgment on arrears.

145. The intervention sought payment and income withholding.

146. Plaintiff alleges this proves causal continuity: Carter's alleged false-consent March 14 support order became the state's Title IV-D enforcement predicate.

147. Plaintiff alleges Myers benefited from that conversion as the identified custodial/support recipient party.

148. Plaintiff alleges Carter was connected because the OAG intervention recognized Carter as Myers's attorney for service and because the intervention relied on the support predicate Carter allegedly caused or supplied.

**H. Office Filer 914, Holly Hayes, Choya Burkley, and non-authenticated OAG authority**

149. The public eService certificate for the June 28 intervention states "Officer Filer 914 on behalf of Holly Hayes," Bar No. 24110698, using csd-filer-914@texasattorneygeneral.gov, Envelope ID 89311887.

150. The intervention's signature block identified Holly L. Hayes as attorney of record.

151. The certificate of service identified or used Choya Burkley in the service certification path.

152. Plaintiff alleges this mismatch created serious red flags regarding who actually signed, filed, reviewed, authorized, supervised, or caused the intervention.

153. Plaintiff repeatedly challenged the intervention and requested identification of the actual signer, filer, reviewer, authorizer, account user, and authority basis.

154. Holly Hayes was never required to appear personally to authenticate or explain the intervention.

155. The OAG was never required to produce a Hayes-specific authorization record before enforcement consequences attached.

156. Plaintiff alleges this violated due process because state enforcement proceeded on a disputed Title IV-D predicate without authenticating the human and legal authority behind it.

**I. Post-trial FOIA materials sharpen the Hayes/OAG issue**

157. After trial and decree-related events, Plaintiff obtained and organized additional public-record information regarding Holly Hayes, Brandon Manus, Office 914, WorkQuest, and the OAG.

158. Plaintiff filed a March 10, 2026 notice of material irregularities regarding the OAG explaining that a public-records production responding to Request No. 100852 did not include Holly Hayes or Brandon Manus in the produced attorney/payroll workbook.

159. Plaintiff alleged that, on February 9, 2026, he requested on the record for Holly Hayes to be produced, but the state court required him to subpoena her despite Hayes being listed as attorney of record.

160. The production contained no employment/payroll records and no alternative contractor/third-party compensation records for Hayes or Manus.

161. Plaintiff later filed an April 16, 2026 notice of a new FOIA evidence path.

162. Plaintiff alleges the March 26, 2026 Comptroller response classified Holly L. Hayes and Brandon E. Manus in CAPPS as contingent workers and stated that no other information was available for them in the Comptroller payroll and compensation database.

163. Plaintiff alleges the CAPPS excerpt placed Hayes in Child Support, CS Fort Worth Metro, job code NONEMP / Non Employee, location 914, at 2001 Beach Street, Suite 800, Fort Worth, Texas 76103.

164. Plaintiff alleges the statewide employment-history excerpt showed prior Holly L. Hayes state employment ending in 2014 and did not show Hayes as a regular OAG employee in the produced statewide employment-history response.

165. Plaintiff alleges OAG public-information materials identified Brandon Manus as a contractor in CS Ft. Worth Metro.

166. Plaintiff alleges Office 914 WorkQuest / temporary-personnel materials showed repeated Office 914 temporary staffing for Assistant Attorney General positions and related Title IV-D positions across fiscal years.

167. Plaintiff does not plead these records as a final adjudication of wrongdoing.

168. Plaintiff pleads them because they make future reliance on the June 28 intervention constitutionally unsafe unless the State identifies the actual signer, filer, reviewer, authorizer, account user, supervisor, Hayes-specific authority, and Title IV-D authority path.

**J. EFM/OFS/ReSearchTX exact-case data**

169. Plaintiff obtained or organized EFM/OFS/ReSearchTX exact-case records tied to cause number 322-744263-23.

170. The exact ReSearchTX case record carries case_data_id b04183e55b355b628fa3d90671422f9b.

171. The harvested exact-case event set contains 416 event rows and 37 rows with an ofs_filing_id.

172. The June 28 OAG/Title IV-D event carries normalized submitter_full_name Officer Filer 914 and normalized ofs_filing_id 114709923.

173. Raw/camelCase attribution fields include submitterFullName and ofsFilingID or ofsFilingId.

174. The filing code is "(Title IV-D OAG Use Only) Intervention," and the filing description is "INTE."

175. These fields can prove or disprove actual submitter, account user, authority, route, notice recipients, and enforcement predicate status.

**K. NOT SENT records, account anomalies, manual notices, and Wilder's custody role**

176. On March 18, 2025, Plaintiff filed a separate SAPCR petition in cause number 233-765358-25 because emergency child and residence issues were not being heard in the original case.

177. The automated eService certificate for that SAPCR petition listed Morgan, Carter, and Plaintiff, but all three entries showed NOT SENT.

178. A related March 18, 2025 form motion and proposed order used the same eService envelope and also showed NOT SENT entries.

179. These NOT SENT entries show the electronic-service and notice systems did not operate normally at a critical emergency-relief point.

180. On January 26, 2026, Plaintiff filed a notice stating that his EFM/ReSearchTX access appeared altered.

181. The record summary showed an account page, a name-search result tying attorney number -1 to Texas Department of Public Safety TX DPS, and a dashboard with alerts for Holly Hayes, Charles Dustin Myers, and Brandon Manus.

182. On February 5, 2026, Plaintiff filed a notice asserting that case notices had been interrupted and then reappeared after a mandamus filing and denial in appellate cause 02-26-00075-CV.

183. Plaintiff alleges that after the Hayes/Office Filer 914 issue was raised, the clerk/EFM/recipient path became more suspicious because attorney and case-recipient behavior changed and manual notices appeared.

184. Plaintiff alleges attorneys or recipients were removed from or altered in EFM/ReSearchTX service/contact environments after Hayes/Office Filer 914 issues were raised.

185. Plaintiff alleges case notices were manually blocked, interrupted, or not reliably automated, requiring district-clerk manual notice transmissions.

186. On February 10/12, 2026, the state-court packet denying Plaintiff's First Amended Motion to Strike the OAG intervention included a district-clerk email stating that, as ReSearchTX

worked to refine its noticing process, the District Clerk's office would send notices until issues were resolved.

187. On February 23/24, 2026, the signed final decree packet included a district-clerk manual email transmitting the signed order because ReSearchTX noticing issues remained unresolved.

188. On March 30, 2026, the findings packet again included a coordinator transmission email and district-clerk manual-notice email.

189. On April 2, 2026, the renewed-recusal referral order again carried a district-clerk manual-notice email.

190. On April 6, 2026, a district-clerk notice connected a Supreme Court rehearing filing in cause 26-0117 to the trial-court file.

191. These repeated manual notices show automated notice reliability had failed or was unreliable while enforcement and decree consequences continued.

192. Wilder's office is the custodian of the records necessary to determine whether notices were blocked, disabled, suppressed, bounced, manually overridden, selectively restored, manually transmitted, or altered through service-contact/account changes.

193. Wilder's records are necessary to determine whether attorneys were removed, service contacts detached, party recipients altered, notices manually blocked, automated notices suppressed, or case subscriptions changed.

194. Plaintiff seeks no damages from Wilder. Plaintiff seeks preservation and authentication of Wilder records before future reliance on clerk-controlled predicates.

**L. Mandamus and repeated efforts to obtain process**

195. Plaintiff filed approximately eight mandamus petitions or original-proceeding requests across the state-court sequence, including petitions challenging the initial deprivation,

21

temporary-order validity, refusal to hear emergency relief, consolidation, recusal irregularities, OAG/enforcement path, decree/enforcement consequences, and post-decree process failures.

196. Plaintiff also filed rehearing efforts, emergency motions, Rule 12 challenges, summary-judgment motions, recusal motions, Rule 193.6 objections, JNOV, new-trial motions, findings requests, additional findings requests, OAG strike motions, public-information requests, and notices preserving federal claims.

197. These efforts were denied, unresolved on the merits, or failed to correct the underlying process defects.

198. Plaintiff does not plead exhaustion as a requirement for § 1983. Plaintiff pleads the mandamus and preservation history to show diligence, notice, non-waiver, and lack of meaningful state-court correction.

**M. Final trial, decree, and findings**

199. Plaintiff filed a no-evidence summary-judgment motion challenging family violence, active protective-order status, indigence, notice and hearing supporting temporary relief, alleged agreement to March 14 orders, and best-interest proof for restrictive orders.

200. Plaintiff alleges Myers's response was unsigned, relied on future testimony or unauthenticated materials, and failed to identify competent evidence.

201. Plaintiff filed a Rule 193.6 objection before trial asserting that Myers produced no evidence in discovery, submitted new affidavits and allegations late, failed to identify witnesses or supplement disclosures, and offered unauthenticated materials.

202. The state court denied Plaintiff's no-evidence motion immediately before final trial.

203. The final trial proceeded despite unresolved discovery, disclosure, admissions, Rule 193.6, and predicate-authentication defects.

204. Plaintiff alleges Myers presented no exhibits and admitted material falsities regarding family violence and indigence.

205. Plaintiff alleges unpleaded or undisclosed allegations were raised at trial despite Plaintiff's objection and lack of consent.

206. The final decree confirmed child-support arrears and continuing enforcement consequences.

207. The decree did not cure the earlier process injury. It solidified it.

208. The decree did not meaningfully resolve the predicate defects regarding January 16 removal, March 14 false agreement, OAG intervention, Office Filer 914/Hayes authority, Wilder notice failures, EFM/ReSearchTX anomalies, or discovery nonparticipation.

209. The final decree did not accurately stabilize Plaintiff's address/employer reality because the process removed him from the home where his business and work base existed on day one.

210. Plaintiff does not seek federal correction of decree address or employer information. Plaintiff pleads those omissions as injury evidence showing that the decree memorialized a reality caused by earlier process collapse.

211. Plaintiff requested findings of fact and conclusions of law, filed a past-due notice, and requested additional/amended findings.

212. The findings declined or failed to answer core preserved categories, including order-of-referral/associate-judge/de novo issues, initial removal without completed evidentiary hearing, Holly Hayes/OAG/Title IV-D issues, rejection of dispositive challenges, detailed best-interest findings, discovery nonparticipation, trial-use consequences, and arrears basis.

213. These unanswered findings matter prospectively because enforcement officials and clerks continue to rely on disputed records whose predicate integrity remains unresolved.

**VIII. Damages and Injury Allegations**

214. Plaintiff pleads damages against Carter and Myers only, and only to the extent close nexus, joint action, causation, and recoverable injury are established.

215. Plaintiff seeks no damages from Munford, Thornton, Wilder, any state agency, or any county office.

216. Plaintiff alleges damages were caused by the process collapse and private-to-state predicate sequence, not merely by the existence of the final decree.

217. The decree solidified and extended the harm, but the injuries began earlier: January 16 removal, March 6 lockout, March 14 false-consent order path, May 2024 IWO bridge, June 2024 OAG intervention, and continuing reliance on unauthenticated enforcement records.

## A. Constitutional injury

218. Plaintiff was deprived of procedural due process before significant deprivations of home possession, ordinary parental status, property access, business access, support obligations, arrears exposure, wage-withholding exposure, and enforcement consequences.

219. The constitutional deprivation itself caused injury even if some economic damages require later proof.

220. Plaintiff seeks nominal damages for proven constitutional injury.

## B. Home possession, housing stability, and residence injury

221. Plaintiff was abruptly removed from the home at the beginning of the case before meaningful process.

222. The home at 6641 Anne Court was the center of Plaintiff's parenting, business, equipment, internet infrastructure, customer service, personal property, and day-to-day life.

223. The January 16 removal and March 6 lockout caused loss of stable housing and forced Plaintiff into unstable or temporary arrangements to remain near the children.

24

224. Plaintiff incurred increased cost of living and debt because he had to remain near the children while excluded from the residence.

225. Plaintiff's filed Inventory and Appraisal identified $31,544.92 in unsecured liabilities and stated those debts were incurred as a direct result of abrupt removal from the home, which caused a significant increase in cost of living to remain near the children.

226. Plaintiff seeks compensatory damages for housing instability, increased living costs, debt accumulation, and related financial harm in an amount to be proven at trial.

**C. Business access and business value loss**

227. Plaintiff operates a home-based business providing real-time market data systems for stock and options trading analysis through www.fudstop.io.

228. The business generated revenue primarily through subscriber fees and relied on a specialized, robust internet setup and bandwidth at the home address.

229. The business required ultra-low latency connections to process approximately 60 billion data points per minute.

230. Forced removal from the home and inability to access the specialized setup caused critical business failure, loss of service quality, subscriber loss, lost monetization, lost scaling opportunity, and loss of business value.

231. Plaintiff's Inventory and Appraisal states that as of October 2025 the business had 124 active members, including 29 paid and 95 free members.

232. The Inventory and Appraisal states the business had historical members of 624 new members, including 519 paid and 105 free members, and 360 cancelled members, including 352 paid and 8 free members.

233. The Inventory and Appraisal states the business's current tiers included MEMBER PORTFOLIOS w/ PRICE ALERTS at $40/month with 29 members, THE FUDSTOP

LIFETIME MEMBERSHIP at $650/month with 10 members, and Member Portfolio + Webhook Integration at $60/month with 5 members.

234. The Inventory and Appraisal states pre-disruption financial performance from Patreon data as follows: 2022 peak monthly recurring revenue of $14,342.52 and annual revenue of $100,991.73; 2023 peak monthly recurring revenue of $5,098.11 and annual revenue of $45,267.74; 2024 peak monthly recurring revenue of $2,873.59 and annual revenue of $22,277.17; and 2025 monthly recurring revenue of $1,390.57 and annualized revenue of $12,275.12.

235. The Inventory and Appraisal states that using 6x to 10x annual recurring revenue valuation multiples, the 2022 peak-year business value range was $605,950 to $1,009,917.

236. The Inventory and Appraisal states that using the same 6x to 10x annual recurring revenue valuation multiples, the 2025 current business value range was $73,651 to $122,751.

237. The Inventory and Appraisal states the forced displacement and inability to access the home-based business infrastructure caused a catastrophic decline in business value representing a loss of approximately $532,299 to $887,166.

238. Plaintiff pleads business damages in at least the range of $532,299 to $887,166, subject to expert proof, supplementation, and trial evidence.

239. Plaintiff also seeks lost profits, lost subscriber revenue, lost scaling opportunity, lost goodwill, lost customer relationships, lost data-service reliability, lost software monetization, and lost business value in amounts to be proven at trial.

240. Business assets affected included subscriber base and relationships, custom-built data analytics systems, website infrastructure and intellectual property, real-time data analysis

algorithms, reputation and market positioning in the financial-services niche, Discord bots in approximately 75 servers, and the F.U.D.STOP Android mobile application.

**D. Computer equipment and technical property**

241. Plaintiff's Inventory and Appraisal identified separate-property computer equipment valued at approximately $3,000.

242. The listed system included an ASUS system, AMD Ryzen 9 9950X 16-Core Processor, ASUSTeK TUF GAMING X670E-PLUS WIFI motherboard, 96 GB RAM, and Windows 11 Home.

243. Loss of access to computer equipment and specialized infrastructure contributed to business disruption, customer service failures, and inability to maintain revenue.

244. Plaintiff seeks damages for loss of use, loss of access, replacement, depreciation, and related technical-business disruption in amounts to be proven at trial.

**E. Vehicle, repossession, and credit injury**

245. Plaintiff's Inventory and Appraisal identified a 2020 Mazda Mazda3 with an active loan, outstanding balance of $4,767.72, monthly payment of $368.62, and maturity date of September 2, 2026.

246. The Inventory and Appraisal stated the 2020 Mazda had an approximate Carvana value of $18,000 as of October 15, 2025, with equity of approximately $13,721 after loan payoff.

247. The Inventory and Appraisal identified a 2023 Mazda CX-5 as repossessed in February 2025, with deficiency unknown.

248. The Inventory and Appraisal included an exhibit from Mazda Financial Services dated January 10, 2025 stating the vehicle was 122 days late, that the vehicle may be subject to repossession, and that total amount due was $2,235.95.

249. The vehicle delinquency and repossession were caused or substantially contributed to by forced removal, housing instability, business disruption, increased cost of living, and loss of income.

250. Personal property inside the repossessed CX-5 was not returned and is considered lost.

251. Plaintiff seeks damages for vehicle-related losses, repossession injury, deficiency exposure, credit damage, lost transportation, lost personal property, and related financial consequences in amounts to be proven at trial.

## F. Unsecured debt and financial collapse

252. Plaintiff's Inventory and Appraisal listed unsecured liabilities totaling $31,544.92.

253. Those unsecured liabilities included Capital One Mastercard 3053 charged off / closed for $1,844.75; Capital One Mastercard 8972 charged off / closed for $726.13; Capital One Mastercard 8274 charged off / closed for $5,037.98; Capital One Mastercard 4314 charged off / closed for $390.04; Avant Credit Card 0824 closed/overlimit for $10,677.95; Mission Lane / TAB Bank Visa 9798 / Velocity Investments in collections for $2,395.56; Chase Sapphire Preferred 2883 closed for $6,931.28; Chase Bank Credit Card 0107 closed for $1,544.60; and TrueAccord / Chase collection account for $1,996.63.

254. These debts were incurred or materially worsened as a direct result of being abruptly removed from the home, losing business access, and incurring increased cost of living while attempting to remain near the children.

255. Plaintiff seeks compensatory damages for debt accumulation, collection exposure, interest, fees, credit damage, and financial distress in amounts to be proven at trial.

## G. Bank account depletion and personal property loss

256. Plaintiff's Inventory and Appraisal listed a Capital One 360 Checking Account with current balance of $28.80 and available balance of $0.50.

257. The process collapse left Plaintiff financially vulnerable and unable to stabilize housing, business, transportation, and litigation costs.

258. Plaintiff alleges Myers disposed of or caused the loss of personal belongings after Plaintiff was removed from the home.

259. Plaintiff was prevented from accessing the home to determine what personal property remained.

260. Personal property inside the repossessed CX-5 was lost and not returned.

261. Plaintiff seeks damages for financial depletion, personal property loss, loss of use, inability to inventory property, replacement costs, and related harms.

**H. Loss of ordinary relationship with children**

262. The January 16 removal and later false-consent/enforcement sequence deprived Plaintiff of ordinary day-to-day care, control, companionship, school-day routines, home routines, daily interactions, ordinary parenting decisions, and normal presence in the children's lives.

263. The injury was compounded because the deprivation was based on emergency and false-consent predicates not meaningfully tested before being treated as operative.

264. Plaintiff's separate SAPCR and emergency TRO efforts attempted to protect the children and restore process, but those efforts were diverted or consolidated rather than heard on the emergency merits.

265. Plaintiff seeks damages for loss of familial association and parental-status injury against Carter and Myers to the extent allowed by law and proven at trial.

**I. Emotional distress and dignitary harm**

266. Plaintiff suffered severe emotional distress from the no-process sequence.

267. Emotional injuries include fear, anxiety, humiliation, grief, sleep disruption, loss of stability, distress from separation and reduced parenting role, distress from business collapse, distress from unstable housing, and distress from being forced to litigate repeatedly without meaningful answers.

268. Plaintiff spent approximately two and one-half years trying to get the courts and parties to answer straight process questions about removal, consent, OAG authority, Hayes/Office Filer 914, notice irregularities, and enforcement predicates.

269. The repeated failure to answer caused dignitary harm and emotional harm independent of economic damages.

**J. Litigation, mandamus, and exhaustion-related harm**

270. Plaintiff filed approximately eight mandamus petitions or original proceedings, plus rehearing efforts, emergency motions, recusal motions, objections, notices, Rule 12 challenges, summary-judgment motions, JNOV, new-trial motions, findings requests, additional findings requests, OAG strike motions, and public-information requests.

271. These efforts were necessary because each ordinary safeguard failed: the emergency motion was not answered; discovery was not answered; admissions were ignored; summary judgment was denied without burden enforcement; OAG authority was not authenticated; Hayes was not produced; notices became unreliable; and findings did not answer controlling issues.

272. The state case moved forward after significant delay and after Plaintiff had exhausted practical emergency and mandamus efforts.

273. Plaintiff seeks litigation-related damages where recoverable, costs, and any other legally available expenses caused by the private Defendants' alleged joint-action conduct.

**K. Wilder-related notice and record injury**

30

274. Plaintiff suffered separate process injury from unreliable notice, manual notices, EFM/ReSearchTX anomalies, attorney-recipient changes, and inability to authenticate case records used against him.

275. Wilder's records are necessary to determine whether Plaintiff received automated notice, whether notices were suppressed or manually substituted, whether attorney/service contacts were removed, whether party contacts changed, and whether case access was altered.

276. Plaintiff does not seek damages from Wilder.

277. Failure to preserve and authenticate Wilder records contributes to continuing injury because future enforcement may rely on official records whose notice and recipient paths remain unresolved.

## IX. Records Requiring Preservation and Authentication

278. Plaintiff requires preservation and authentication of the following records before additional enforcement reliance:

279. Backend EFM/OFS audit logs and raw payloads for Envelope ID 89311887, normalized ofs_filing_id 114709923, raw/camelCase ofsFilingID or ofsFilingId, submitterFullName, and any submitter field history or absence.

280. Office 914 account maps, permissions, role history, account-user history, and submission-authority records for csd-filer-914@texasattorneygeneral.gov and related CSD-Legal-914 addresses.

281. Identity, role, authority, and supervisor records for the actual human filer, signer, reviewer, authorizer, or submitter for the June 28, 2024 intervention.

282. Hayes assignment, attorney-of-record, Government Code § 402.029 notice, contract, supervision, signer-identification, and authority records for Plaintiff's case.

31

283. Choya Burkley role, review, signature, certificate-of-service, supervisory, and attorney-of-record records for the June 28 intervention.

284. WorkQuest/OAG assignment records, time records, invoices, voucher backup, POCNs, supervisor approvals, and payment support for Office 914 Title IV-D legal work around June 28, 2024.

285. Case-notice subscription history, service-contact history, party-contact history, attorney-recipient history, bounce logs, suppression logs, disabled-notice logs, manual-notice reason codes, and Tyler/ReSearchTX support tickets for cause number 322-744263-23 and cause number 233-765358-25.

286. EFM/ReSearchTX account-change logs for Plaintiff's account, including role changes, firm-admin settings, attorney-number changes, linked-identity changes, login/access history, and account-access history.

287. Attorney-removal, attorney-addition, party-recipient, case-recipient, and service-contact change records after Plaintiff raised Hayes/Office Filer 914 issues.

288. Title IV-D cost-allocation, reimbursement, and performance-incentive records sufficient to determine whether the disputed Office 914 activity was charged, claimed, reported, reimbursed, or incentivized as valid Title IV-D work.

289. Clerk-controlled transaction, ledger, docket, service, certificate, recipient, manual-notice, file-stamp, notice-transmission, case-access, and case-configuration records used to establish notice, service, party status, attorney-recipient status, or enforcement predicates affecting Plaintiff.

290. Wilder records showing whether any attorney or service contact was removed, detached, substituted, hidden, manually overridden, or altered in EFM/ReSearchTX after Plaintiff raised the Hayes/Office Filer 914 issue.

291. Wilder records showing whether notices were blocked, suppressed, bounced, disabled, manually substituted, manually transmitted, selectively restored, or otherwise not sent through ordinary automated notice channels.

292. Records showing whether any valid motion to enforce, motion to confirm arrears, IWO submission, arrears calculation, payment-record authentication, or Chapter 157 predicate was filed, served, heard, admitted, and relied on before final-trial arrears confirmation and before future enforcement reliance.

293. Records showing whether the March 14 temporary orders were prepared by Bacalis or Carter, whether any motion to sign was filed, whether any agreement on form existed, whether any hearing transcript supports the order, and whether any de novo/referral predicate was satisfied.

294. Records showing whether the January 16 removal occurred after a completed evidentiary hearing, what evidence was admitted, what findings were made, and what authority was used.

### X. State-Action, Close-Nexus, and Joint-Participation Allegations
295. Plaintiff incorporates all prior allegations.

296. Plaintiff recognizes that private litigants and private attorneys do not become state actors merely by filing papers, making arguments, appearing in court, requesting relief, or opposing an adverse party.

297. Plaintiff does not sue Carter or Myers because they litigated against him.

298. Plaintiff sues Carter and Myers because their alleged conduct crossed from ordinary litigation into a close-nexus and joint-participation chain: private defendants allegedly supplied,

used, represented, or operationalized disputed predicates that state actors, police-facing authority, official filing systems, and Title IV-D enforcement machinery then adopted, enforced, or treated as authority for deprivation.

299. Myers initiated the disputed emergency/protective-order/residence-exclusion path that produced the January 16 removal-before-completed-hearing deprivation.

300. Myers's private use of the developing court-paper trail then allegedly caused police-facing dispossession on March 6, 2024 when she locked Plaintiff out of the home while he was walking the children to school and used court papers or the associate-judge report with responding officers.

301. Carter then supplied the March 14 temporary-order paperwork that allegedly falsely represented or operationalized agreement, evidence, prerequisites, and consent.

302. Carter supplied or presented that paperwork without responding to Plaintiff's emergency motion and without following the required motion-to-sign path.

303. The state actor adopted Carter's paperwork.

304. The adopted paperwork became the predicate for OAG enforcement.

305. Carter's May 2024 IWO email attempted to operationalize the same disputed predicate into wage withholding.

306. The OAG intervention relied on the March 14 order as the prior support order and sought arrears and withholding.

307. Myers was identified as the custodial/support party, and Carter was identified as Myers's counsel in the OAG service path.

34

308. Carter and Myers continued using or benefiting from the same predicates after repeated notice, objections, discovery, mandamus, Rule 12 challenges, OAG challenges, summary-judgment filings, and post-trial filings.

309. Their alleged conduct became effective only through state adoption, police-facing authority, judicial signature, IWO threat, OAG enforcement, and clerk/EFM notice systems.

310. Plaintiff alleges this satisfies close-nexus and joint-participation pleading at the screening stage.

## XI. Counts
**Count I — Procedural Due Process / Ex parte Young Prospective Relief Against Thornton**
311. Plaintiff incorporates all prior allegations.

312. Plaintiff has protected interests in wages, money, property, credit, employment continuity, home-based business access, notice, court access, access to official records, and a meaningful opportunity to contest enforcement predicates before state-backed collection or withholding consequences are imposed or continued.

313. Plaintiff alleges ongoing and threatened deprivation through Title IV-D reliance on disputed and unauthenticated predicates, including the June 28 OAG intervention, Office Filer 914 records, Hayes/Burkley signer and authority records, March 14 support order, alleged arrears, payment records, wage-withholding exposure, Title IV-D enforcement records, contractor/Office 914 account paths, and cost-allocation/reimbursement predicates.

314. The process provided is constitutionally inadequate because no responsible official has identified and authenticated the actual filer, signer, reviewer, authorizer, account holder, supervisor, attorney authority, contractor authority, or audit trail for the June 28 intervention and related Title IV-D enforcement path.

315. Thornton is a proper Ex parte Young defendant because the challenged ongoing enforcement posture depends on Child Support Division enforcement, Title IV-D records, payment processing, wage-withholding systems, arrears records, and future official reliance on the disputed intervention path.

316. Plaintiff does not seek to stop lawful child-support enforcement based on authenticated records and constitutionally adequate process.

317. Plaintiff seeks only to prevent additional enforcement reliance on specifically disputed and unauthenticated predicates unless the relevant records are preserved, identified, authenticated, and Plaintiff is afforded a meaningful opportunity to contest them.

318. Plaintiff seeks no damages on Count I.

**Count II — Final-Trial No-Motion Enforcement and Monetary-Adjudication Due Process Against Thornton**

319. Plaintiff incorporates all prior allegations.

320. Plaintiff alleges there was no clear docketed motion to enforce support, confirm arrears, reduce temporary-order support to a cumulative money judgment, or support final-trial monetary enforcement before the final-trial arrears adjudication sequence.

321. The OAG and related actors were permitted to participate in or benefit from enforcement consequences before Plaintiff had meaningful notice of a motion-to-enforce predicate and before the challenged filing, signer, and authority architecture was meaningfully authenticated.

322. This deprived Plaintiff of meaningful notice and opportunity to contest before monetary and enforcement consequences were imposed or continued.

323. Plaintiff seeks prospective relief requiring preservation and authentication of the final-trial participation record, authority record, arrears-calculation record, motion-to-enforce record,

payment-record authentication, and enforcement predicate record before additional future reliance.

324. Plaintiff does not ask this Court to recalculate support, erase arrears, or reverse the final decree.

325. Plaintiff seeks no damages on Count II from official-capacity Defendants.

**Count III — District Clerk Notice, Recipient, EFM/ReSearchTX, and Case-Record Preservation Against Wilder**
326. Plaintiff incorporates all prior allegations.

327. Wilder is the proper official-capacity record custodian for clerk-controlled case records, notices, service contacts, recipient histories, attorney-recipient histories, transaction records, ledgers, file stamps, manual-notice emails, certificates, attorney-removal records, and case-access records.

328. Manual notice handling, NOT SENT records, recipient-status changes, EFM/ReSearchTX account anomalies, attorney-recipient changes, attorney-removal events, and repeated manual district-clerk notices materially affected process participation and notice integrity before additional enforcement reliance.

329. The District Clerk's office repeatedly sent manual notices because ReSearchTX notice issues remained unresolved.

330. After Hayes/Office Filer 914 issues were raised, EFM or case-recipient anomalies made it necessary to preserve logs showing whether attorneys, recipients, service contacts, or case notices were removed, blocked, disabled, altered, suppressed, or manually overridden.

331. Wilder records are necessary to authenticate whether Plaintiff had notice, whether court records correctly reflected attorneys and recipients, whether service contacts were altered, and whether future enforcement is relying on reliable court records.

332. Plaintiff seeks no damages from Wilder.

333. Plaintiff seeks prospective relief requiring preservation, production, and authentication of clerk notice, recipient-contact, attorney-recipient, service-contact, attorney-removal, manual-notice, suppression/bounce, transaction, ledger, file-stamp, and account-related records used as process or enforcement predicates.

334. Plaintiff does not seek generalized federal supervision of the Tarrant County District Clerk, ReSearchTX, Tyler, or EFM.

335. Plaintiff seeks only records necessary to authenticate notice and enforcement predicates used against him.

**Count IV — Narrow Declaratory Relief Against Munford in Official Capacity Only**
336. Plaintiff incorporates all prior allegations.

337. Plaintiff pleads this count because unresolved predicate-formation defects remain live and relevant to future enforcement reliance in the same cause.

338. Plaintiff seeks a declaration that future reliance on disputed predicate records in the same cause requires constitutionally adequate authentication and opportunity to contest.

339. Plaintiff seeks no damages from Judge Munford.

340. Plaintiff does not ask this Court to review, vacate, modify, direct, or control any state-court family-law ruling.

341. Plaintiff does not ask this Court to order Judge Munford to rule a particular way.

342. If this count is barred by judicial immunity, Rooker-Feldman, abstention, Article III limits, or any other doctrine, Plaintiff requests dismissal or severance of Count IV only.

**Count V — Administrative-Process Equal Protection / Class-of-One Declaratory Claim Against Munford**
343. Plaintiff incorporates all prior allegations.

38

344. Plaintiff alleges he was intentionally treated differently in process administration from ordinary litigants whose notices, service contacts, filing records, referral materials, hearings, dispositive motions, and findings are maintained consistently, transparently, and with ordinary safeguards.

345. The unequal treatment included unresolved notice irregularities, referral ambiguity, coordinator-routed recusal issues, failure to resolve predicate-authentication issues, and continued movement toward final trial while threshold process defects remained unanswered.

346. Plaintiff alleges there was no rational basis for refusing to answer or resolve the predicate defects while continuing to enforce or preserve their consequences.

347. Plaintiff seeks declaratory relief only and no damages.

348. If this count is barred or insufficient, Plaintiff requests dismissal or severance of Count V only.

**Count VI — § 1983 Damages Against Carter on Close-Nexus / Joint-Action Theory**
349. Plaintiff incorporates all prior allegations.

350. Carter is not sued because she represented Myers.

351. Carter is sued because she allegedly supplied, presented, and operationalized disputed predicate records that state actors adopted and state enforcement later used.

352. Carter's conduct included appearing after the January 16 removal; using the existing emergency/removal posture; participating in the February 1 report path while the protective-order allegations were being nonsuited or abandoned; failing to respond to Plaintiff's emergency motion before March 14; handing Plaintiff typed temporary orders at the March 14 hearing; preparing, supplying, or presenting March 2024 temporary-order documents treated as agreed despite lack of consent; presenting or supplying a proposed denial / associate-judge report path to deny Plaintiff's emergency motion without a substantive response; causing or contributing to

39

state adoption of Carter-prepared temporary orders; sending the May 9 IWO email describing the IWO as agreed and ordered; and continuing to rely on disputed predicates through final-trial and post-trial proceedings.

353. Carter's conduct caused state-backed deprivation through alleged-agreement language, court-paper use, proposed-order adoption, IWO pressure, and OAG/Title IV-D enforcement predicates.

354. Carter's conduct caused home-access injury, business-access injury, business value loss, parental-status injury, property-access injury, debt accumulation, vehicle/credit injury, housing instability, emotional distress, and inability to contest enforcement on authenticated records.

355. Plaintiff seeks compensatory, nominal, and punitive damages against Carter.

**Count VII — § 1983 Damages Against Myers on Close-Nexus / Joint-Action Theory**
356. Plaintiff incorporates all prior allegations.

357. Myers is not sued merely because she filed for divorce or sought relief.

358. Myers is sued because she initiated, used, and sustained disputed predicates that caused state-backed deprivation before meaningful process.

359. Myers's conduct included initiating the emergency/protective-order and residence-exclusion sequence; participating in or benefiting from eviction/removal before meaningful adjudication; locking Plaintiff out on March 6 while he walked the children to school; using court papers or the associate-judge report with responding officers; continuing to use and benefit from alleged-agreement temporary-order predicates after Plaintiff objected; failing to respond to discovery and admissions testing family violence, protective-order status, financial representations, home removal, support, and best-interest predicates; continuing to benefit from the OAG/Title IV-D and arrears enforcement path after Plaintiff challenged Office Filer 914, Hayes authority, and

40

lack of authenticated signer/filer records; and participating in final-trial and post-trial enforcement consequences while disputed predicates remained unauthenticated.

360. Myers's conduct caused home-access injury, loss of ordinary child relationship, business value loss, property loss, debt accumulation, vehicle/credit injury, housing instability, emotional distress, and inability to contest enforcement on authenticated records.

361. Plaintiff seeks compensatory, nominal, and punitive damages against Myers.

**Count VIII — Procedural Due Process Damages Against Carter and Myers for False-Consent Predicate Injury**
362. Plaintiff incorporates all prior allegations.

363. Plaintiff alleges Carter and Myers caused or participated in a false-consent predicate that state actors adopted or enforced.

364. The false-consent predicate included representations, assumptions, or uses of "agreement" despite Plaintiff's lack of consent to the March 2024 filed temporary orders and his repeated objections.

365. The false-consent predicate caused state-backed deprivation of home, child-access posture, support obligations, arrears, wage-withholding exposure, and enforcement exposure.

366. Plaintiff was deprived through alleged agreement rather than meaningful notice, hearing, consent, evidence testing, and authentication.

367. Plaintiff seeks damages from Carter and Myers only if close nexus, joint action, causation, and injury are proven.

**Count IX — Procedural Due Process Damages Against Carter and Myers for Private-to-State Enforcement Bridge**
368. Plaintiff incorporates all prior allegations.

369. Plaintiff alleges Carter and Myers participated in converting disputed private litigation predicates into state enforcement machinery.

41

370. The bridge included the March 14 disputed order path, May 2024 IWO effort, June 2024 OAG reliance, and later arrears/withholding/enforcement consequences.

371. Plaintiff was deprived of meaningful process before state-backed enforcement consequences.

372. Plaintiff seeks damages from Carter and Myers only if close nexus, joint action, causation, and injury are proven.

**Count X — Supplemental State-Law Abuse of Process Against Carter and Myers**
373. Plaintiff incorporates all prior allegations except where inconsistent.

374. Plaintiff alleges Carter and Myers used process after issuance for collateral purposes, including to maintain home exclusion, deepen leverage, sustain alleged-agreement predicates, create wage-withholding pressure, and convert disputed temporary orders into Title IV-D enforcement consequences before resolving predicate consent, authority, and authentication.

375. Plaintiff alleges misuse of process included use of court papers during the March 6 lockout, use of alleged-agreement language after objection, May 2024 IWO pressure, continued reliance on disputed predicates after Plaintiff's challenges, and use of enforcement machinery to maintain an advantage created without meaningful process.

376. Plaintiff seeks damages if Texas abuse-of-process elements are proven.

**Count XI — Supplemental State-Law Intentional Infliction of Emotional Distress Against Carter and Myers**
377. Plaintiff incorporates all prior allegations except where inconsistent.

378. Plaintiff alleges Carter and Myers engaged in extreme and outrageous conduct by using or benefiting from emergency, eviction, lockout, alleged-agreement, IWO, OAG, and enforcement predicates after repeated notice that the predicates lacked true consent, meaningful evidentiary testing, and authenticated authority.

379. Plaintiff alleges the conduct was intentional or reckless because Plaintiff repeatedly objected, filed emergency motions, served discovery, sought mandamus, challenged attorney and OAG authority, filed no-evidence papers, filed Rule 193.6 objections, and requested findings on the same issues.

380. Plaintiff alleges severe emotional distress including fear, anxiety, humiliation, family disruption, housing instability, business and financial distress, sleep disruption, and prolonged emotional injury from the no-process home, parenting, business, property, and enforcement sequence.

381. Plaintiff seeks damages to the extent Texas law permits.

## XII. Requested Relief

382. Plaintiff respectfully asks the Court to enter only relief that can be granted without vacating, modifying, recalculating, or reversing the Texas decree.

383. Plaintiff requests a declaration that future reliance on disputed Title IV-D, Office Filer 914, Hayes, Burkley, alleged-agreement, IWO, EFM/OFS/ReSearchTX, clerk-notice, attorney-recipient, attorney-removal, and service-contact predicate records for additional enforcement against Plaintiff requires constitutionally adequate preservation, identification, authentication, and meaningful opportunity to contest.

384. Plaintiff requests a declaration that disputed enforcement consequences may not constitutionally proceed prospectively based solely on unauthenticated or non-consensual predicate records where Plaintiff has specifically challenged the actual signer, filer, reviewer, authorizer, account authority, attorney authority, notice status, service-contact status, EFM account path, or Title IV-D basis.

385. Plaintiff requests prospective injunctive relief against Thornton, her successor, and officials in active concert or participation with her, prohibiting additional Title IV-D enforcement reliance

43

against Plaintiff in cause number 322-744263-23 based on disputed predicates unless the predicates are preserved, identified, authenticated, and Plaintiff is afforded a meaningful opportunity to contest them.

386. Plaintiff requests prospective relief against Wilder, or successor record custodian, requiring preservation and authentication of clerk-controlled notice, recipient, attorney-recipient, attorney-removal, service-contact, transaction, ledger, file-stamp, manual-notice, EFM/ReSearchTX, and case-access records used as predicates for enforcement or case notices affecting Plaintiff.

387. Plaintiff requests narrow declaratory relief against Judge Munford only to the extent the Court finds a live, non-barred Article III controversy and only insofar as relief does not direct, revise, or control any state-court judgment.

388. Plaintiff requests compensatory damages against Carter and Myers in amounts to be proven, including business value loss estimated at approximately $532,299 to $887,166; unsecured liabilities of $31,544.92; vehicle and repossession losses including 2023 CX-5 repossession and 2020 Mazda equity harm; computer equipment/loss-of-use damages including equipment valued at approximately $3,000; personal property losses; housing instability costs; loss of income; loss of customer/subscriber revenue; loss of familial association; emotional distress; and related damages.

389. Plaintiff requests nominal damages against Carter and Myers for proven constitutional injury.

390. Plaintiff requests punitive damages against Carter and Myers for evil motive, intent to injure, or reckless indifference to federally protected rights.

391. Plaintiff requests supplemental state-law damages against Carter and Myers for abuse of process and intentional infliction of emotional distress.

392. Plaintiff requests costs and all other relief to which he is justly entitled, so long as relief does not require this Court to vacate, modify, reverse, recalculate, stay, or otherwise act as an appellate tribunal over the Texas divorce decree.

393. If any defendant, count, or remedy is barred by immunity, jurisdiction, abstention, Rooker-Feldman, domestic-relations limits, state-action insufficiency, or pleading insufficiency, Plaintiff requests dismissal or severance of only that defendant, count, or remedy while preserving all viable independent federal claims.

## XIII. Jury Demand

394. Plaintiff demands a jury on all claims so triable.

## XIV. Rule 11 Certification and Signature

395. Plaintiff certifies that this pleading is not presented for an improper purpose, that the legal contentions are warranted by existing law or by a nonfrivolous argument for extension, modification, or reversal of existing law, and that the factual contentions have evidentiary support or will likely have evidentiary support after reasonable discovery.

Dated: April 27, 2026.

Respectfully submitted,


*/s/ Charles Dustin Myers*
Charles Dustin Myers
Pro se Plaintiff
1209 Blairwood Drive
Flower Mound, Texas 75028
Telephone: 469-770-0671
Facsimile: None
Email: chuckdustin12@gmail.com
Bar No.: N/A (pro se)

45

Certificate of Service

Because service has been withheld pending screening and no defendant has appeared, Plaintiff

will file this document with the Clerk of Court and will comply with any service instructions

ordered by the Court.

*/s/ Charles Dustin Myers*

Charles Dustin Myers